IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| LISA LIVINGSTON, | ) | 2:26-cv-2022-BHH-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | COMPLAINT |
| vs. | ) | (JURY TRIAL REQUESTED) |
| | ) | |
| TRIDENT TECHNICAL COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT AND JURY DEMAND

The Plaintiff, Lisa Livingston, by and through her attorney, Bonnie Travaglio Hunt of Hunt Law, L.L.C., hereby files the Plaintiff's Complaint against the Defendant, Trident Technical College (hereinafter referred to as Trident or TTC) a higher education institution in the State of South Carolina Technical College System, as follows:

## NATURE OF THE ACTION

1. This action is brought by the Plaintiff pursuant to Title VII of the Civil Rights Act of 1964 of the United States for sex discrimination, race discrimination, hostile work environment, and retaliation.

2. The jurisdiction of this Court is invoked to secure protection of and redress deprivation of rights guaranteed by federal law and state law which rights provide for injunctive and other relief for illegal discrimination in employment.

3. This action is brought pursuant to Federal Law of the United States and the laws of South Carolina.

1

## PARTIES

4.      Mrs. Livingston is an individual who resided in the State of South Carolina at all times relevant to this action.

5.      At all relevant times to the allegation in this complaint, Mrs. Livingston was an employee of the Defendant, Trident Technical College, in South Carolina.

6.      At all times, relevant to the allegations in this complaint, Mrs. Livingston was employed at a facility operated by the Defendant, Trident Technical College, in the State of South Carolina.  Trident Technical College serves as a public community college offering various degree programs and certifications.

7.      On information and belief, Defendant, Trident Technical College, is an entity conducting business and affecting commerce in the state of South Carolina properly within the jurisdiction of the Court.

8.      At all times, relevant to the allegations in this Complaint, the Defendant employed more than 20 persons in the State of South Carolina.

9.      At all times, relevant to the allegations in this Complaint, the Defendant operated at several facilities in the State of South Carolina.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 as this matter presents a federal question.

11.     Jurisdiction of this cause arises under Title VII of the Civil Rights Act of 1964 (Title VII).

12.     This Court further has jurisdiction in that the amount in controversy exceeds the jurisdiction of this Court according to proof at trial.

2

13.    The Charleston Division is the proper venue for this action because this is the District and Division in which a substantial part of the events or omissions give rise to the claims occurred.

**Procedural Prerequisites**

14.    Mrs. Livingston filed a charge of discrimination against the Defendant, Trident Technical College, with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination, sex discrimination, hostile work environment, and retaliation.

15.    Mrs. Livingston's first charge of discrimination was dated January 11, 2026, and set forth the following:

I.    *That I am a former employee of the Employer that was terminated from my position as Assistant Vice President of Finance & Business Affairs. I was hired by the Employer on August 6, 2007, as an Accountant/Financial Analyst II. That I worked my way up to an Assistant VP. That I was considered an exemplary employee until a new Vice President of Finance & Business Affairs was hired.*

II.    *That I was treated differently based on my race and sex.*

III.    *In February of 2025, the College hired Kevin Beck as the Vice President of Finance & Business Affairs. Not long after beginning his employment he was treated differently by being allowed to telework despite not meeting the specifications of the executive order of the Governor.*

IV.    *Beck began a campaign to ruin my reputation, bully, abuse, discipline and terminate my employment based on my sex. Beck consistently treats women differently and subjects them to a hostile work environment.*

V.    *That the college has not terminated other male employees for failure to perform but created positions for them to stay at the college.*

VI.    *That my work environment was severe and pervasive, so I reported the hostility to Human Resources. As a result of that report I was placed on a PIP and then terminated before the end of the PIP.*

VII.    *That on 1/4/2026 I contacted the EEOC and filed an inquiry with a copy going to DeVetta Hughes, HR.*

VIII.    *That Human Resources failed and refused to protect me a Caucasian female. That Human Resources is rampant with favoritism towards African American Employees.*

IX.    *That due to Human Resources propensity to favor African Americans they permitted my supervisor to treat me differently and subject me to discrimination in violation of Title VII.'*

X.    *That I was disciplined differently and subjected to harsher discipline than African American employees.*

XI.    *That on January 6, 2026, I was terminated. My termination was delivered by Devetta Hughes. That Hughes refused to discipline African Americans as Caucasians.*

3

XII.   *That each and every reason created by Beck was pretextual.  Specifically, his reasons for placing me on a PIP, failing to allow me to complete the PIP and terminating form my employment were pretextual and retaliation in violation of Title VII.*

XIII.  *That the employer further subjected me to a retaliatory hostile work environment for my complaints regarding differential treatment and retaliation.*

XIV.   *That I have been discriminated against based on my race in violation of Title VII.*

XV.    *That I have been discriminated against based on my sex in violation of Title VII.  Other male employees have not been disciplined, subjected to a hostile work environment and were not terminated from their employment.*

XVI.   *That I have been retaliated against in violation of Title VII for my previous complaints regarding discrimination, differential treatment and hostile work environment.*

16.   The EEOC confirmed receipt of the Charge of Discrimination on January 12, 2026.

17.   Trident Technical College filed a position statement with the EEOC.

18.   The EEOC investigated Mrs. Livingston's charge of discrimination.

19.   That Mrs. Livingston received a right to sue from the U.S. Equal Employment Opportunity Commission on April 4, 2026.

20.   That the Right to Sue set forth the EEOC issues the following determination:

*NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)*
*The EEOC has grated your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the date the charge was filed.*
*The EEOC is terminating its processing of this charge.*
*NOTICE OF YOUR RIGHT TO SUE*
*This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal. You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.) If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 415-2026-00705.*

21.   That fewer than ninety days have elapsed since Mrs. Livingston received the Right to Sue on Mrs. Livingston's charge of discrimination.

**TRIDENT TECHNICAL COLLEGE**

**POLICIES AND PROCEDURES**

4

22.    The Defendant, Trident, issued all employees an Employee Handbook and Policies and Procedures Manual Disclaimer and Acknowledgment.

23.    Trident's mission statement was *"Educate the individual. Accelerate the economy. Inspire the future."*

24.    The Employee handbook set forth the Role and Scope of Trident:

*Role and Scope*

*Trident Technical College is a public, two-year, multi-campus community college that provides quality education and promotes economic development in Berkeley, Charleston, and Dorchester counties. An open-door institution of higher education, and one of the largest institutions in the state, Trident Technical College welcomes and serves students from the rich variety of backgrounds in its service area.*

*To help students meet their goals, the college offers applied technical associate degrees, diplomas, certificates, and university transfer associate degrees. The curriculum includes programs in arts and sciences; business; culinary and hospitality; education; engineering and manufacturing; health, human and personal services; information technology; law and criminal justice; maintenance and technical trades; and media and visual arts. Additionally, the college offers high school dual enrollment partnerships, apprenticeship programs, customized workforce training, and personal enrichment opportunities. To foster student success, the college provides multiple course delivery methods and comprehensive academic and student support services.*

25.    The Employee Handbook further set forth the following:

*Affirmative Action and Non-Discrimination*

*Trident Technical College recognizes and is fully committed to its legal obligations to provide equal opportunity to prospective and existing employees without regard to any factor protected under applicable federal, state and local civil rights laws, rules and regulations (collectively referred to as "Protected Status"). The College will make all decisions regarding recruitment, hiring, training, promotions and all other terms and conditions of employment without discrimination based on Protected Status or any other factor which cannot lawfully be the basis for an employment decision.*

*Access the* *Affirmative Action and Non-Discrimination Policy* *at* *http://www.tridenttech.edu/about/policies/8_hr/8-1-0.htm.*

*Ultimate responsibility for equal opportunity and its full achievement through the*

5

*Affirmative Action Policy rests with the President of TTC. Overall responsibility for implementation of the Affirmative Action Policy is delegated by the president to the Associate Vice President for Human Resources who is the Equal Employment Opportunity/Affirmative Action Officer for the College.*

*Operational responsibility for compliance with the Affirmative Action Policy is delegated to the Associate Vice President for Human Resources and to the vice presidents, deans, department heads, directors and other supervisors through the College's Employment Practices Procedure (8-1-1).*

*Diverse communications mediums are utilized to keep the employees and the public informed of this Affirmative Action Policy. TTC's website, employee handbooks, orientation for new employees, in-house publications, mail and word of mouth emphasize TTC's commitment to a program of equal employment opportunity. All major publications state that the College is an equal opportunity employer. The Vice President for Advancement is responsible for assuring that an Affirmative Action policy statement is included in all major college publications. The Associate Vice President for Human Resources is responsible for assuring that the Affirmative Action Policy is followed in employment advertisements and other recruiting activities. An Equal Employment Opportunity/ Affirmative Action (EEO/AA) statement is included in all classified employment advertisements placed by the College. The Director of Procurement and Risk Management is responsible for assuring that an EEO/AA statement appears on all appropriate college purchasing contract forms.*

*To assure that qualified minority and female applicants are considered for vacant positions in the institution, TTC has a centralized employment office through which all applicants are recruited and from which all referrals are made. TTC has a program of affirmative recruitment for minority group members and women in all job categories in which they are found to be underutilized. In all positions, regardless of whether or not such underutilization currently exists, the College pursues a program of open recruitment to avoid the possible discriminatory effects of informal job networks.*

### *Affirmative Action and Non-Discrimination  (Cont)*

*TTC uses a formal hiring procedure in order to ensure equal opportunity and affirmative action in employment.*

*TTC Procedure 8-1-1, Employment Practices, was developed in conjunction with the Affirmative Action Policy and is in TTC's Policy and Procedures Manual. The procedure helps ensure that TTC will not select individuals for employment or promotion on the basis of job qualifications, written tests or other devices which screen out minorities or women at a greater rate than others and are not conclusively demonstrated to be related significantly and directly to job performance.*

*TTC recognizes that to some extent, achievement of equitable distribution of minorities and women throughout all job classifications in the College as projected in the goals will be the result of initial assignments, subsequent transfers, promotions and training. To assure that minorities and women are given access affirmatively to all positions and all lines of progression within the College, the following procedures shall apply:*

● *Employees wishing to apply for jobs within the institution must initiate the application process themselves. All employees are permitted to apply for transfer or promotion for higher or more favorable positions in the institution without advance approval by, or notice to, their present supervisor. However, employees will continue to be expected to give advance notice of a change, as would be the case in accepting a position outside of the institution.*

● *Referrals for job interviews are made on the basis of valid job qualifications. In accordance with the institution's selection procedures, employees who apply for promotion or transfer will compete with other applicants on the same basis.*

● *Voluntary career counseling is available from Human Resources for assisting employees in achieving career advancement. Emphasis will be on advancement into positions from which minorities and women have been excluded or significantly under-represented.*

● *TTC is committed to the principle and practice of equal pay for equal work as required by the Equal Pay Act of 1964, Title VI and Title VII of the Civil Rights Act of 1964 (as amended), and all other laws. In no case will the College place similarly qualified individuals performing substantially the same work under comparable conditions in different wage or salary levels on the basis of gender, minority status or any other factor not permitted by law.*

● *All covered full-time TTC employees have the same benefits plan regardless of race, color, disability, religion, gender, age or national origin. The benefits plan includes all leave policies, medical, hospital and life insurance programs, all retirement and pension programs and all other benefits provided by the College.*

● *Should a reduction-in-force become necessary, it shall be the College policy to release employees in an equitable manner, which to the greatest extent possible, minimizes the adverse effects of such reduction on both the College and the affected employees. Toward this end, the College complies with SBTCE Procedure 8-7-103.1, Reduction in Force.*

### *Equal Opportunity and Title IX*

*Trident Technical College functions in compliance with the Executive Order 11246; Title II of the Education Amendments of 1976; Title VI and Title VII of the Civil Rights of 1964, (as amended); Title IX Regulations Implementing Education Amendments of 1972; Section 504 of the Rehabilitation Act of 1973; the Americans with Disabilities Act of 1990; and all other federal and state laws, regulations and policies. Trident Technical College does not discriminate on the basis of race, color, disability, religion, gender, sexual orientation, age, national or ethnic origin, marital status, veteran status, gender identity, or pregnancy in the educational programs or activities which it operates.*

### **FACTUAL BACKGROUND**

26. Mrs. Livingston has over 30 years' experience in public sector finance and municipal budgeting, including prior service with Charleston County Government and approximately nineteen years of service with Trident Technical College.

7

27. Ms. Livingston holds an Associate in Business from TTC (1990), a Bachelor's in Accounting (1998), and an MBA (2008). Mrs. Livingston began her employment with Trident in 2007 as an Accountant/Fiscal Analyst II. While employed with Trident from 2007 to 2009 she obtained her Master of Science, in Business Administration.

28. Mrs. Livingston pursued her career with Trident and worked her way up to Assistant Vice President of Business Affairs. During her Mrs. Livingston's employment she assumed increasing levels of responsibility in finance and business operations and developed substantial institutional knowledge concerning the College's budgeting, accounting and administrative functions.

29. During her employment Mrs. Livingston received at a minimum an exceeds on all her employment evaluations with Trident.

30. In February 2025, Kevin Beck became Mrs. Livingston's supervisor. Beck's position was the Vice President of Finance & Business Affairs reporting to the President of Trident Technical College, Vicky Wood. The Position was the following: VICE PRESIDENT FOR FINANCE & BUSINESS AFFAIRS - Responsible for planning, directing, and administering a comprehensive business and administrative operations division through managing professionals engaged in budget development and tracking; fiscal records and accounting; internal review and accountability; college bookstore; procurement of goods and services; and related activities.

31. In April of 2025, Beck evaluated Mrs. Livingston. Mr. Beck evaluated her performance with an exceeds to include comments such as "Ms. Livingston has been intentional on improving relationships, communication and collaboration within the division-in particular she has been receptive and successful in building a culture of trust, transparency and

continuous improvement.  I applaud her actions and leadership in this area."  Mr. Beck went on to state "Ms. Livingston helped me to successfully prepare for my first area commission meeting.  She has also helped guide and mentor the Budget Director in the development of County Budgets.  To the latter, Ms. Livingston helped strategically develop and successfully deliver our talking points to Dorchester County administrator."  Mrs. Livingston having been employed with the College for several years cooperated with Mr. Beck's changed mission for the College and always maintained her professionalism.

32. In June of 2025, Beck decided to restructure the finance team, citing an intent to "flatten" the organizational hierarchy of the Budget and Finance Division. As part of this reorganization, he shifted one of Mrs. Livingston's direct reports (Budget Director) to his own supervision, thereby diminishing her departmental oversight and altering the established reporting structure.

33. Despite Mrs. Livingston's cooperation, Beck set out to ruin Mrs. Livingston's reputation and employment by creating pretextual reasons to discipline and terminate her employment.  Beck began to systematically bully, harass and treat her unfairly.  Beck's actions affected Mrs. Livingston's wellbeing, reputation, and her exemplary employment record.

34. TTC has a precise and extensive Affirmative Action and non-discrimination policy which allegedly provides equal opportunity and protection to all employees against discrimination and hostile work environments.  The overall responsibility for the implementation of these EEO policies is delegated to the Associate V.P. of HR.  HR failed and refused to protect Mrs. Livingston from Mr. Beck's aggressive and discriminatory behavior.

9

35. Mrs. Livingston had to constantly request that Mr. Beck maintain a professional work environment, cease the use of profanity, stop dropping the F bomb constantly, and to treat her with dignity and professionalism as required by Title IX. When Mrs. Livingston started complaining about the hostile work environment and the treatment, she was receiving Mr. Beck decided to discipline and terminate her employment.

36. Mr. Beck accused Mrs. Livingston of avoiding a difficult situation because she called out sick two days in a row. Mr. Beck's attack on Mrs. Livingston's reputation and character was unprofessional and unwarranted.

37. On two different occasions Mrs. Livingston submitted documentation to Mr. Beck for review on time and in a professional manner and he failed to review it. Then blamed her for his failure because she did not raise it to his attention that he was going to miss a deadline. Placing this burden on the Assistant Vice President is making the AVP responsible for a VP schedule which is contradictory to the requirements of an AVP. The administrative role is not an AVP responsibility

38. On September 24, 2025, when an employee was terminated DeVetta Hughes, Human Resources Director sent an email to Beck informing him: *"Allow her to remove her personal files while in the office. I don't want her to go to a lawyer and say we treated her like a criminal on top of the other stuff she has said. We have always allowed employees to do that. We shouldn't have personal files on the college laptop, but it happens."*

39. On October 24, 2025, Mrs. Livingston went to another part of the office and when she entered the office she stated "I know you are going to be made at me." When she entered the office Mrs. Davis lunged at Mrs. Livingston. Mrs. Livingston was instructed to go to her office which she immediately did to de-escalate the situation. Later, Mrs. Davis and

Mrs. Livingston engaged in a calm conversation regarding their roles and how to correct the errors that had occurred with the SCDOR letters.

40.     On October 28, 2025, Beck sent an email to Director of HR, DeVetta Hughes and Copied Mrs. Livingston, the email set forth the following:

*"Hope all is well.  Helen said that your team does an excellent job on supporting formal written warnings.  Would you mind having the team draft up something for me that I can tweak as needed. Note, I would probably start with something that says:  As leaders at the College, we are expected to set and uphold a culture of Respect and Professionalism.  These expectations have been set on multiple occasions and are in alignment with the College's Policies and Procedures (cite…) and the College's Personnel Handbook (cite…).  Your Actions on October 24, 2025 were contrary to the Culture of Respect and Professionalism, and erode trust in leadership and reduce our ability to hold others accountable for their actions.  To which, …(see memo for record)1.  You pushed through the VP of Finance and Business Affairs disrespectful and unprofessional…; 2. Your non-verbals to the VP of Finance and Business Affairs, including but not limited to staring angerly, as well as raising your voice to the AVP Finance and Business Affairs and did not relent when asked by the VP of Finance and Business Affairs, was disrespectful and unprofessional…; 3.  You openly questioned leadership's decision and did not support leadership in front of an employee, when leadership asked for a pivot in business process and you were provided ample opportunity to provide your perspective and were provided full transparency behind the decision…disrespectful and unprofessional; 4.  By repeatedly accusing leadership of calling employee a liar in an email. I have reviewed the letter and that statement was out of context, further escalating the situation…disrespectful and unprofessional.*
*Please see attached email.  I have let Lisa know that you may be requesting a statement from her and have not provided any bias."*

41.     Following that communication, AVP DeVetta Hughes initiated a disciplinary process directed at Mrs. Livingston, although Plaintiff alleges that Mrs. Livingston was the target of the aggression rather than the instigator. Plaintiff further alleges that Human Resources did not conduct a neutral investigation and instead used the incident as part of the disciplinary process against Mrs. Livingston.

42.     On November 18, 2025, Mrs. Livingston was issued a Performance Improvement Plan (PIP) by Kevin Beck, Vice President of Finance & Business Affairs.  At the same time, Beck issued Mrs. Livingston a Reprimand for Conduct and Communication.   Mrs.

Livingston filed a formal response to Beck's discipline.  The PIP set forth several issues by Mr. Beck:

a.  -Mr. Beck only made generalized and unsubstantiated assertions of deficiency.

b.  Mr. Beck contends that Mrs. Livingston never took responsibility for her actions. Mrs. Livingston specifically stated that she remained committed to intensive reflection upon and appropriate adjustment of her communication style to ensure that the delivery of her professional directive aligned with high-level executive intent.

c.  Mr. Beck contended that Mrs. Livingston was only at the college on October 24, 2025, to precipitate conflict.  However, this statement is inherently false as the error with the SCDOR letters needed to be handled immediately to mitigate the financial risk to the institution.

d.  Mrs. Livingston admitted that the regrettable statement "I know your mad at me" to Gemilia Davis was only an attempt to mitigate and de-escalate the palpable tension evident upon her arrival where Mr. Beck, Ms. Davis and Ms. Halaran were engaging in a conversation.

e.  The only intent of Mrs. Livingston was to obtain a critical update concerning and emergent SCDOR issue.

f.  After the incident, Mr. Beck allegedly commended Mrs. Livingston for her leadership during the event. Plaintiff further alleges that Mr. Beck stated he intended to report Ms. Davis' actions to Human Resources and that, if he had behaved as Ms. Davis did, his own supervisor would have formally reprimanded him or worse.

g.  Mrs. Livingston further alleged that Mr. Beck followed up with a text message to Mrs. Livingston on October 26, 2025, stating, "Gamellia was unprofessional."

However, Beck later decided to discipline Mrs. Livingston in contradiction to the actual occurrence and the statements made to her.

h. In the PIP, Mr. Beck addressed budget and grants issues, but Mrs. Livingston alleges he had already removed those duties from Mrs. Livingston's responsibilities. In an email dated December 17, 2025, Beck reiterated that Budget and Grants were removed from Plaintiff's direct responsibilities therefore the plaintiff alleges those duties did not constitute 30 percent of her position.

i. During this period, Mrs. Livingston explicitly documented a toxic and hostile work environment, formally presenting these grave concerns to AVP of Human Resources DeVetta Hughes, Vice President Kevin Beck, and President Vicky Wood.

j. Plaintiff alleges that, in a contradictory display of leadership, Mr. Beck instructed Mrs. Livingston to implement specific administrative changes but later shifted blame to her when those changes met internal resistance.

k. Plaintiff alleges that Mr. Beck specifically instructed an employee to send SCDOR letters that should not have been sent. Mrs. Livingston was not in the office on that date, yet Plaintiff alleges Mr. Beck blamed her for the letters being sent.

l. As to the bookstore, which was under Mrs. Livingston's purview, Plaintiff alleges that Mr. Beck received a decision memorandum in April concerning its operational challenges but failed to address it, thereby limiting her ability to implement long-term changes.

m. Plaintiff alleges that the Performance Improvement Plan drafted by Vice President Beck was fundamentally flawed because it contained only generalized and unsubstantiated assertions of deficiency. Plaintiff further alleges that, by failing to

13

provide objective metrics or specific instances of substandard performance, the PIP functioned not as a developmental tool but as a pretext for a predetermined termination..

43. Mrs. Livingston presents that the Defendant's disciplinary response to the October 24, 2025 incident departed from standard procedures. While Mrs. Livingston was subjected to severe punishment on November 18, 2025, Ms. Davis was not issued discipline until November 19, 2025, at 9:17 p.m., Vice President Beck issued a non-punitive 'verbal warning' by email to Ms. Davis. Plaintiff alleges that this delayed and comparatively lenient response reflects disparate treatment in the College's disciplinary process.

44. On November 19, 2025, Kevin Beck informed Gemellia Davis that her contact did not meet expectations on October 24, 2025, and issued her a verbal warning. Ms. Davis was physically lunged at Mrs. Livingston but was not disciplined for those actions. The discipline was not taken until after Mrs. Livingston's and was almost a month after the incident.

45. On December 8, 2025, Beck informed Mrs. Livingston he expected her to be more proactive in delegating when she is out of work for illness.

46. Human Resources by and through DeVetta Hughes failed and refused to recognize that Mrs. Livingston had filed a response until December 9, 2025. Mrs. Livingston requested the involved of a Representative from State Human Resources Office (SHRO). Trident by and through Hughes refused to have SHRO involved in Mrs. Livingston's complaints claiming that counseling, disciplinary actions and PIP were all internal supervisory and institutional processes. Hughes further informed Mrs. Livingston that employees do not

have the right to require the attendance or involvement of an SHRO representative in internal meetings.

47. After each PIP meeting Mrs. Livingston specifically requested certain actions be taken but none were by TTC or HR to protect her from the environment she was being subjected to.

48. During Mr. Beck's meetings regarding the PIP, he continued to make generalized statements and confirmed those statements in his notes to Mrs. Livingston's file. Mr. Beck did not clarify or state specifics on how Mrs. Livingston was not adhering to his expectations. Specifically, Mr. Beck failed and refused to address the following:

   a. Effective relationships-did not state who she was not maintaining an effective relationship with or how he wanted her to improve it.

   b. Demonstrate technical acumen through effective strategic planning and management. Mr. Beck failed to state how Mrs. Livingston failed in demonstrating her strategic planning and management and how he wanted her to improve it.

   c. Proactive ownership and responsibility. Mr. Bech again failed to provide specifics or information on how to improve.

49. The failure to provide concise instances and how to improve led to an inability to correct any behavior for Mrs. Livingston considering the generalized and unsubstantiated assertions.

50. TTC has a progressive discipline policy, but Mr. Beck failed to utilize or complete the steps of the policy. TTC specifically states that the intent of the discipline policy is to be corrective not punitive in nature. However, in each statement by Mr. Beck Mrs. Livingston was berated, belittled and treated as substandard when her performance was exemplary by her evaluation history. Mr. Beck's observations were of Mrs. Livingston were directly

related to her disability with her back and therefore further created a hostile work environment.

51.     In Mr. Beck's notes regarding these meetings he specifically addresses Mrs. Livingston's body language.  Mr. Beck was aware of Mrs. Livingston's Disability as she has a titanium cuff in her spine that affects her posture, gate and body language.  Specifically addressing the body language of an individual with a disability that does not allow for her to present as an individual without a disability is a violation of the Americans with Disabilities Act.

52.     On December 9, 2025, Mrs. Livingston specifically responded to Mr. Beck's accusations to HR and addressed the issue of his organization climate and inconsistent backing from his office on departmental issues has evidenced a documented fear of executive staff that there will be reprisal for implementing his changes.  Mrs. Livingston specifically suffered this reprisal.  Mrs. Livingston specifically accused Mr. Beck of failing to consistently and publicly back her when she has implemented his changes. Therefore, Mrs. Livingston was the escape goat for the work environment and Mr. Beck's failures

53.     Because of the interaction during these meetings with Mr. Beck, Mrs. Livingston requested that HR be present.  HR refused stating they do not do that type of thing.

54.     Mrs. Livingston copied President Vicky Wood and AVP DeVetta Hughes on her rebuttals, thereby giving senior leadership contemporaneous notice of her objections to the disciplinary process in real time.

55.     On December 17, 2025, Beck accused Mrs. Livingston of unprofessional behavior in an email and that is why he could not review a document.  However, Beck failed to state what that behavior or how he wanted it corrected which was the purpose of the PIP process.

16

56.   Mrs. Livingston went on approved annual leave from December 18, 2025 until January 1, 2026.

57.   Mrs. Livingston returned to work after the Christmas Break on Friday January 2, 2026.

58.   On January 4, 2026, Mrs. Livingston filed an inquiry with the EEOC.  Mrs. Livingston provided the email of her employer in the on-line inquiry for service.

59.   On the morning of January 5, 2026, Mrs. Livingston sent an email to Kevin Beck letting him know that she wanted to attend GFOA (Government Finance Officers Association)training.  The training was being provided in Charleston SC and would not require travel.  There was no response to this email.

60.   On January 5, 2026, at 4:11 p.m., Mrs. Livingston, who was on a performance improvement plan, sent a second email to Mr. Beck inquiring about a meeting she witnessed him having with her subordinate regarding roles and responsibilities. There was no response to this email.

61.   Mr. Beck responded that Mrs. Livingston's inclusion was not appropriate, was outside her job duties, and that her attendance was not required. Plaintiff alleges that Beck treated that email, together with her earlier concerns, as the final incident supporting termination.

62.   Shortly thereafter, Beck sent an email to Human Resources stating, "this is further confirmation that a pending decision of termination is warranted."

63.   On January 6, 2026, Mrs. Livingston was terminated from her employment by Kevin Beck. Beck contended the decision was based on insubordination, a pattern of unprofessional conduct and that he no longer wished to work with her.

64.   During the final exchange on January 6, 2026, AVP DeVetta Hughes twice stated to Mrs. Livingston, "you know its not  DeVetta terminating you." Plaintiff alleges that this

statement reflected alignment with Mr. Beck rather than the neutrality expected of Human Resources.

65. On January 8, 2026, Mrs. Livingston requested her personal items that she was not permitted to retrieve from her office after her termination.

66. The Reasons provided to Mrs. Livingston for the PIP and Termination are not valid and were a violation of the Policy of the college as Mr. Beck did not have the authority to terminate Mrs. Livingston's employment.

67. TTC's HR has failed to ensure a fair and consistent application of disciplinary measures for the same or similar offenses. HR and Beck have perpetrated an inconsistent application of rules to Mrs. Livingston. Previously there have been violations by others that have led to reassignment, but they still maintained their pay. Specifically, a male employee who was allegedly moved due to non-performance.

68. Mrs. Livingston witnessed others who were not disciplined for aggressive and belligerent behavior. Specifically African American employees in her own department that had favorable relationships with individuals in Human Resources.

69. Mrs. Livingston became the subject of Mr. Beck's tirade, and he performed the exact same actions against her that he vowed would be performed against another employee utilizing Mrs. Livingston as the escape goat for his own failures. The other employee an African American employee was not subjected to the same discipline when she actually made physical threats shoving into Mr. Beck but wan not disciplined.

70. The Treatment of Mrs. Livingston after her termination was abhorrent. Mrs. Livingston was treated as a criminal. In fact, Ms. Hughes specifically stated when dealing with another employee not to treat that employee as Mrs. Livingston was treated because she did not

18

want the other employee to feel like a criminal. Therefore, further perpetrating differential treatment towards Mrs. Livingston in violation of the policies of TTC.

71.    Mrs. Livingston's termination was in violation of the policies of TTC, State and Federal Law. Mrs. Livingston's termination was in retaliation for her complaints regarding hostile work environment and EEOC complaint.

72.    Mrs. Livingston filed a grievance and followed all required steps. Each step was denied by the College.

73.    After Mrs. Livingston's termination she applied for benefits with the South Carolina Department of Employment and Workforce. The claim was initially denied. However, after a hearing, the Hearing Officer determined that Mrs. Livingston was entitled to benefits and was terminated for cause.

74.    Throughout Mrs. Livingston's employment she realized that Caucasians were treated differently than African American employees due to the Human Resources director being African American. The differential treatment was prevalent when Mrs. Livingston was disciplined for the incident in October, but the African American employee was not and she assaulted an individual and lunged at Mrs. Livingston.

75.    The Defendant, TTC failed to protect Mrs. Livingston from discrimination.

76.    Mrs. Livingston was retaliated against for her complaints regarding Beck's behavior and inquiry with the EEOC.

77.    Mrs. Livingston was aware that there were several other employees that were subjected to differential treatment based on their race. That the Human Resources Director seemed to be only concerned regarding African American employees and especially those that were members of her sorority.

19

78. During Mrs. Livingston's employment, Mrs. Livingston suffered discrimination based on her race, sex, retaliation for her complaints and hostile work environment in violation of the Defendants' policies and procedures and the law.

79. That each of the reasons provided by the Defendant for not enforcing their own policies regarding Mrs. Livingston's work environment was meant to harass Mrs. Livingston, harm Mrs. Livingston, and retaliate against Mrs. Livingston.

80. That Defendant wrongfully discriminated against Mrs. Livingston in violation of Title VII.

81. That each reason presented by the Defendant for the discipline and or termination was pretextual. The Defendant has published a false narrative regarding Mrs. Livingston's employment in order to perpetuate a discriminatory hostile work environment that has led to severe emotional distress.

82. The defendant's actions described herein were intentional and inflicted upon Plaintiff severe mental and emotional distress.

83. As a result of Defendant's actions, Mrs. Livingston has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity, reputation, and other intangible injuries for all of which she should be compensated.

84. That the Defendant is the direct and proximate cause of injury to Mrs. Livingston.

85. That Mrs. Livingston was issued certain policies and procedures by the Defendant that were supposed to protect her from this type of behavior. However, due to the fact that Trident's HR was not favorable to Caucasians, Mrs. Livingston's claims and complaints were doomed from the beginning.

86. The Defendants violated the policies and procedures by failing to follow the actual policies in place against discrimination, hostile work environment and retaliation.

87. Defendant engaged in policies and practices which willfully, intentionally, and unlawfully discriminated against Mrs. Livingston on the basis of her race and sex in violation of Title.

88. That the Defendant, treated the Mrs. Livingston differently based on her sex by Beck and race based on the way that Human Resources treated her.

89. Mrs. Livingsont was treated less favorably than her African American coworkers.

90. That the Defendant's actions towards Mrs. Livingson based on her race and sex violated the law.

91. That, as a direct and proximate result of the Defendant's intentional unlawful actions towards Mrs. Livingston based on Mrs. Livingston's race and sex , Mrs. Livingston:

   a.   suffered severe emotional distress;

   b.   suffered future lost wages and future lost benefits;

   c.   suffered economic damages;

   d.   Loss of employment;

   e.   Loss of Future employment;

   f.   incurred attorney fees for this action;

   g.   incurred costs of this action; and

   h.   will incur future attorney fees and costs.

92. That Mrs. Livingston is entitled to an award of damages in the amount of actual damages, compensatory damages, consequential damages, punitive damages, attorney's fees previous, future and present, costs of previous future and this action, and other damages such as this Honorable Court deems appropriate and just.

21

## FOR A FIRST CAUSE OF ACTION

## RACE AND SEX DISCRIMINATION IN VIOLATION OF TITLE VII

## AGAINST TRIDENT TECHNICAL COLLEGE, TTC

93.    That Paragraphs one (1) through ninety-two (92) are hereby incorporated verbatim.

94.    Defendant discriminated against Mrs. Livingston in violation of Title VII and pursuant to South Carolina Law, which protects employees from retaliation.

95.    That Mrs. Livingston was an employee according to the law of the State of South Carolina, Federal Law including but not limited to Title VII.

96.    The Defendant is an employers within the applicable State and Federal Laws.

97.    Mrs. Livingston was subjected to differential treatment based on her race.

98.    Mrs. Livingston was not treated fairly or equally as African American Employees.  In fact, Mrs. Livingston was not subjected to the protection of the policies of Trident.  Beck was going to discipline an African American employee with a formal written warning, but after involving DeVetta Hughes an African American the discipline was changed to Mrs. Livingston receiving the written warning and the African American only receiving a verbal warning.

99.    Mrs. Livingston was treated differently based on her race.  The African American lunged at Mrs. Livingston and only received a verbal warning for her actions.

100.    The Defendant's actions described herein were intentional and inflicted upon Mrs. Livingston to insure severe mental and emotional distress.

101.    As a result of Defendant's actions, Mrs. Livingston has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain

22

and suffering, mental anguish, humiliation, embarrassment, personal indignity, and other intangible injuries for all of which she should be compensated.

102. That the Defendant is the direct and proximate cause of injury to Mrs. Livingston discriminating against her based on her race.

103. That Mrs. Livingston is entitled to an award of damages from the Defendant. That Mrs. Livingston is entitled to recover damages from the Defendant in the amount of actual damages, consequential damages, punitive damages, reasonable attorney's fees, the costs of this action and all other damages available pursuant to Title VII.

## FOR A SECOND CAUSE OF ACTION

## RETALIATION FOR COMPLAINTS IN VIOLATION OF TITLE VII AGAINST

## TRIDENT TECHNICAL COLLEGE, TTC

104. That Paragraphs one (1) through one hundred and three (103) are hereby incorporated verbatim.

105. Defendant retaliated against Mrs. Livingston in violation of Title VII, which protects employees from retaliation for engaging in activities protected under Title VII and pursuant to South Carolina law, which protects employees from engaging in the same activity.

106. That Mrs. Livingston participated in a protected act when she differential treatment based on her sex, reported racial discrimination, racial harassment, and hostile work environment.

107. Mrs. Livingston clearly reported hostile work environment when she requested protection from Human Resources by having a representative present during her meetings with Beck.

108. That Beck treated Mrs. Livingston belligerently and disrespectfully in their PIP meetings in retaliation for her complaints regarding his unprofessionalism, and hostile work environment.

109.    That the Defendant allowed Mrs. Livingston to be discriminated against based on her race in violation of the Defendant's own policies and procedures.

110.    That the Defendant failed and refused to correct the behavior.  That the behavior became worse after Mrs. Livingston's reports.

111.    Mrs. Livingston was informed that there was nothing that could be done against her harasser.

112.    That the Defendant allowed supervisors, human resources, and administration to treat African American employees more favorably without repercussions.

113.    That Mrs. Livingston was further subjected to worse behaviors after she complained regarding Beck's behavior.  Mrs. Livingston was clearly bullied as a result of being a Caucasian and performing all aspects of her positions.

114.    That the reasons provided by the Defendants as the reasons for her termination were pretextual and created by others who discriminated against Mrs. Livingston.

115.    That the Defendant discriminated against Mrs. Livingston based on her race.

116.    That the Defendant took adverse employment action against Mrs. Livingston by:

      (a)    Failing to protect Mrs. Livingston from a Racially Hostile work environment;

      (b)    Failing to protect Mrs. Livingston from Discrimination/hostile work environment; and

      (b)    Refusing to enforce its own policies concerning discipline of employees engaging in harassing comments.

117.    That the Defendant subjected Mrs. Livingston to discrimination in violation of the law.

118. That as a result of Mrs. Livingston's complaints Mrs. Livingston suffered retaliation for each of her complaints.

119. As a result of Mrs. Livingston's complaints regarding discrimination based on her Race, Retaliation, and hostile work environment based on her previous complaints the Defendant retaliated against Mrs. Livingston.

120. The Defendant's actions described herein were intentional and inflicted upon Plaintiff to insure severe mental and emotional distress.

121. As a result of Defendant's actions, Plaintiff has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity, and other intangible injuries for all of which she should be compensated.

122. That the Defendant is the direct and proximate cause of injury to Mrs. Livingston.

123. That Mrs. Livingston is entitled to an award of damages from the Defendant. That Mrs. Livingston is entitled to recover damages from the Defendant in the amount of actual damages, consequential damages, punitive damages, reasonable attorney's fees, the costs of this action and all other damages available pursuant to Title VII and 42 U.S.C. 1981.

## FOR A THIRD CAUSE OF ACTION

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII TRIDENT TECHNICAL COLLEGE, TTC

124. That Paragraphs one (1) through one hundred and twenty-three (123) are hereby incorporated verbatim.

125. That Mrs. Livingston was an employee of the Defendant.

126. That the Defendant is an employer in accordance with Title VII and 42 U.S.C. 1981.

25

127. Each and every action taken by the Defendant's employees instituted a work environment that no reasonable person would subject themselves to.

128. That the Defendant subjected Mrs. Livingston to a hostile work environment.

129. That Mrs. Livingston's work environment was abusive, to the point of severe and pervasive.

130. That the actions of hostility were daily, by email, text, conversations, demands for meetings and harassing behavior in meetings.

131. Mrs. Livingston was subjected to discrimination based on her Race and Sex.

132. That the Defendant failed and refused to address the situation.

133. As set forth above, Mrs. Livingston was harassed on a daily basis by management for her complaints.

134. Management intentionally and purposefully subjected to a severe and pervasive work environment in retaliation for her complaints.

135. That Mrs. Livingston suffered severe emotional distress as a result of the Defendant's hostile work environment based on Mrs. Livingston's Race and Sex.

136. That Mrs. Livingston's severe emotional distress was foreseeable as a result of the severe and pervasive work environment that the Defendant subjected Mrs. Livingston to.

137. That Mrs. Livingston has been damaged as a result of the Defendant work environment.

138. That the Defendant is the direct and proximate cause of damage to Mrs. Livingston.

139. Mrs. Livingston is entitled to all damages under the law that are permitted, including actual damages, compensatory damages, consequential damages, punitive damages, attorney fees and costs of pursuing this action.

## PRAYER FOR RELIEF

WHEREFORE plaintiff prays that this Honorable Court:

A.  Accept jurisdiction over this matter, including the pendent claim;

B.  Empanel a jury to hear and decide all questions of fact;

C.  Award Mrs. Livingston lost wages, future lost wages, lost benefits and future lost benefits;

D.  Award to plaintiff compensatory and consequential damages against the defendant;

E.  Award to plaintiff punitive damages against the defendant for their malicious and spiteful pattern of sex and race discrimination;

F.   Award to plaintiff All damages available to Mrs. Livingston damages against the defendant for their malicious discrimination against Mrs. Livingston in violation of the Title VII;

G.  Award to plaintiff the reasonable attorneys' fees and costs incurred in the prosecution of this matter;

H.  Award all damages available to Mrs. Livingston pursuant to Federal and State Law;

I.  Permanently enjoin the defendants, their assigns, successors, agents, employees and those acting in concert with them from engaging in sexual discrimination, disparate treatment or retaliation against plaintiff and

J.  Enter any other order the interests of justice and equity require.

> HUNT LAW LLC
> *s/Bonnie Travaglio Hunt*
> Bonnie Travaglio Hunt
> *Attorney for Mrs. Livingston*
> HUNT LAW LLC
> 4000 Faber Place Drive, Suite 300
> North Charleston SC 29405
> Post Office Box 1845, Goose Creek, SC 29445
> (843)553-8709

Dated: May 19, 2026

27